UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

*FILED IN OPEN COURT ON 8/24/09*

| | |
|---|---|
| In re:<br><br>LAVIGNE, INC.,<br><br>Debtor. | Chapter 11<br>Case No. 09-42771 (JBR) |

### AFFIDAVIT OF JOHN F. IPPOLITO

I, John F. Ippolito, being duly sworn, do hereby depose and say:

1. I am the Managing Director of Axia Advisors, LLC ("Axia"), an advisory firm located at 1 Van de Graaff Drive, Suite 104, Burlington, Massachusetts.

2. This Affidavit is submitted in connection with the Debtor's motion seeking leave to sell substantially all of its assets. Except as otherwise indicated, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.

3. Axia has been in the business of providing operational and investment-banking services since 2004. It specializes in developing profitable relationships between buyers, sellers and investors. Axia's professionals have extensive experience in providing investment banking solutions to financially distressed companies that are desirous of entering into a going-concern sale transaction to preserve the value of the company. In that regard, Axia uses its extensive contacts within any relevant industry to identify and qualify potential strategic counterparts. It also analyzes company data to prepare the information memorandum that is distributed to potential bidders and facilitates the diligence process with interested parties. Once an offer is received, Axia typically assists management in evaluation of the proposed transaction terms and in negotiations.

4.  Axia was first engaged by the Debtor on or about April 3, 2009 pursuant to an engagement letter. Thereafter, in July, 2009, upon the Debtor's filing of its petition pursuant to Chapter 11 of the Bankruptcy Code, the Debtor sought leave to engage Axia for the purpose of rendering post-petition services, primarily in conducting a sale process geared towards soliciting overbids to a proposed sale to HubCast, Inc. Axia's post-petition employment was authorized by this Court by Order dated July 31, 2009.

5.  Upon its initial engagement in April, 2009, Axia drafted a Confidential Information Memorandum (CIM). That CIM contained a history of the Debtor, an overview of its business, summary financial information, industry trends and other information that might be relevant to potential purchasers considering an acquisition of the Debtor or its assets. The content of the CIM was based on interviews conducted by Axia with key LVI personnel and several facility visits to LVI's Worcester plant, as well as a detailed review of the Debtor's audited financial statements and unaudited internal financial statements.

6.  Axia also compiled information traditionally required by prospective purchasers in undertaking due diligence regarding a potential acquisition, and participated in the construction of a virtual diligence room.

7.  Once the CIM was compiled, Axia developed a prospective buyer database, based on our knowledge of qualified printing organizations, primarily in the eastern Massachusetts area. That prospective buyer database included both strategic and financial targets.

8.  During the month of April, Axia contacted a total of fifteen (15) parties that it had previously identified as prospective purchasers and had included in the database. Of those

fifteen parties, seven (7) executed non-disclosure agreements ("NDAs"), received CIMs and were afforded the opportunity to conduct due diligence.

9. Two of those seven parties made proposals. HubCast proposed a transaction in which it would pay $1.385 million and satisfy various liabilities associated with contracts that it would assume, inclusive of assuming the lease for the Debtor's facility and satisfying the cure obligation attendant upon such assumption. The other party making a proposal, Dynagraf, offered through an informal e-mail, financial consideration and a deal structure that provided less cash consideration at closing, and was, therefore, viewed as inferior.

10. Upon informing HubCast that its proposal was viewed as the more attractive of the two, HubCast agreed to spend the resources on a definitive agreement, to make a deposit and to serve as the stalking horse in a sale process to be conducted before this Court pursuant to §363 of the Bankruptcy Code.

11. Upon the Debtor's July 9, 2009 filing of its Chapter 11 petition, Axia re-contacted each of the original 15 parties, as well as an additional forty-four (44) parties. The additional parties contacted included both regional and national strategic and financial buyers.

12. As a result of Axia's post-petition contacts, six (6) additional NDAs were executed. Those parties were each afforded the opportunity to conduct due diligence. From the total of thirteen (13) parties who executed NDAs and received CIMs, four (4) parties requested, and were granted, in-person meetings with CEO Chris Wells and were given facility tours. Three of the four parties had two in-person meetings with Chris Wells.

13. Of the four parties that conducted in-person meetings and otherwise undertook due diligence, three withdrew without structuring bids. The companies, and their stated reasons for withdrawing were the following:

- Universal Millennium, Westwood, Massachusetts—the price being offered by HubCast was higher than they felt reasonable. Also, the business was too small and troubled to justify making a bid.

- Dynagraf, Inc., Canton, Massachusetts—the price being offered by HubCast was higher than they were willing to pay, particularly given that there was no working capital adjustment mechanism in the APA and a key asset to be acquired, Accounts Receivable, fell from over $800,000 on June 30, 2009 to $618,000 on July 31, 2009.

- David Bryson, Northampton, Massachusetts (printing entrepreneur)—the assets are old, and the business may be too distressed to justify the risk of purchasing at HubCast's price.

14. Several other parties, while their diligence did not progress to management interviews, commented that the price offered by HubCast was higher than they would be willing to consider, based on the CIM and their knowledge of the business.

15. The post-petition efforts of Axia did, however, produce one qualified overbid. That bid has been submitted by DS Graphics of Lowell, Massachusetts. DS Graphics has offered to purchase substantially all assets of the Debtor for cash consideration of $1.55 million on virtually identical terms to those offered by HubCast. It has also offered to assume certain liabilities associated with assumption of certain contracts. Although, unlike HubCast, DS Graphics has not agreed to assume the lease of the Debtor's facility, it has requested that the Debtor make arrangements for DS Graphics to occupy the Debtor's facility for a transition period, during which period DS Graphics would pay any rent due under the Lease. I understand that the Debtor has indicated that, should DS Graphics be determined to be the party submitting

the highest and best bid entitled to purchase the Debtor's assets, the Debtor will seek an extension of time within which to assume or reject that lease.

Signed this ___ day of August, 2009, under the pains and penalties of perjury.

_____
John F. Ippolito,

# 8783498_v1