# ASSET PURCHASE AGREEMENT

### by and between

### LaVigne Inc.

### as Seller

### and

### D. S. Graphics, Inc.

### as Purchaser

### dated as of

### August 19, 2009

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement"), dated as of July __, 2009 (the "Execution Date"), is entered into by and between LaVigne Inc., a Massachusetts corporation (the "Seller") and DS Graphics, Inc.., a Massachusetts corporation (the "Purchaser").

## W I T N E S S E T H

**WHEREAS,** Seller intends to file a petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court") on or before July 9, 2009 (the "Bankruptcy Case");

**WHEREAS,** upon the terms and subject to the conditions set forth herein, the Seller desires to transfer, sell, convey, assign and deliver to the Purchaser, and the Purchaser desires to acquire from Seller, the Transferred Assets, as defined below, and Purchaser desires to assume certain contracts of the Seller primarily incurred in connection with the Transferred Assets in accordance with the terms and subject to the conditions of this Agreement (the "Proposed Transaction"); and

**WHEREAS,** the parties desire to consummate the Proposed Transaction, including (i) the sale of the Transferred Assets to the Purchaser pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code, free and clear of all Liens, other than Assumed Liabilities and Permitted Exceptions, and (ii) the assumption by the Seller and subsequent assignment to the Purchaser, pursuant to Section 365 of the Bankruptcy Code, of all Assigned Contracts to be assigned to the Purchaser under this Agreement, as promptly as practicable after the Bankruptcy Court enters an order approving the Proposed Transaction (the "Sale Approval Order").

**NOW, THEREFORE,** for and in consideration of the premises and the mutual covenants and agreements contained herein, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I.

## DEFINITIONS

Section 1.01    Definitions.

The following terms, as used in this Agreement, shall have the following meanings:

"Accounts Receivable" shall mean all accounts receivable of the Seller, including without limitation all notes receivable and trade receivables.

"Acquisition Documents" shall mean, collectively, this Agreement, the Bill of Sale and the Assignment and Assumption Agreement and all agreements, instruments, certificates and other documents executed and delivered in connection herewith or contemplated hereby.

"Action" shall mean any claim, dispute, demand, cause of action or action asserted in any arbitration, litigation, adversary proceeding, mediation, suit, investigation or other proceeding and any appeal therefrom.

"Affiliate" shall mean, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  As used in this definition, the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct the management policies of such Person, whether through the voting power of outstanding securities, by contract or otherwise.

"Agreement" shall mean this Asset Purchase Agreement and shall include all of the Schedules and Exhibits attached hereto.

"Approval" shall mean any approval, authorization, consent, license, franchise, order or permit of or by, notice to, or filing or registration with, a Person.

"Assets" shall mean both the Transferred Assets and the Excluded Assets.

"Assigned Contracts" shall mean the Contracts listed for assignment on Schedule I to Exhibit A hereto.  Subject to the requirements of Section 2.03(b) hereof, the Purchaser shall have the right by written notice delivered to the Seller and the Committee within five (5) days after entry of the Sale Approval Order, to add any Contract, provided, in each case, that such additional Contract has not been previously rejected in the Bankruptcy Case, and provided further that (a) the Seller's obligations with respect to any additional Contract so added shall be limited to filing a motion with the Bankruptcy Court to approve the assumption and assignment of such Contract to the Purchaser (to the extent such a motion has not already been filed) and using commercially reasonable efforts to effectuate such transfer and (b) to the extent such Contract is added subsequent to the Closing Date, the Purchaser shall pay all amounts which may be payable pursuant to 11 U.S.C. § 365(b) on account of the assignment and assumption of such Contract, including all amounts which may be payable pursuant to 11 U.S.C. § 365(b) on account of the assumption and assignment of any Assigned Contract.  Failure of the Bankruptcy Court to approve the assumption and assignment of any Contract shall not constitute a material breach of any covenant or agreement that could allow the Purchaser to terminate this Agreement. In addition, the Purchaser shall have the absolute right to remove any Contract from Exhibit A, thereby removing that Contract from the list of Assigned Contracts, up to the date and time of the final hearing on the Sale Motion.

"Assignment and Assumption Agreement" shall mean the Assignment and Assumption Agreement, substantially in the form attached hereto as Exhibit A.

"Assumed Liabilities" shall have the meaning ascribed to such term in Section 2.03 hereof.

"Bankruptcy Case" shall have the meaning ascribed to such term in the recitals to this Agreement.

"Bankruptcy Code" shall have the meaning ascribed to such term in the recitals to this Agreement.

"Bankruptcy Court" shall have the meaning ascribed to such term in the recitals to this Agreement.

"Bill of Sale" shall mean the bill of sale transferring to the Purchaser the Transferred Assets, substantially in the form attached hereto as Exhibit B.

"Books and Records" shall mean originals or copies of all books, financial and other records and information which has been reduced to written, recorded or encoded form, in each case to the extent related to the Transferred Assets.

"Business" shall mean the business encompassed by the Transferred Assets.

"Business Day" shall mean a day that is not a Saturday, a Sunday or a day on which banks in the State of Delaware are required or authorized to close for regular banking business.

"Claims" shall mean all claims, causes of action, choses in action, rights of recovery and rights of set-off of whatever kind or description against any person or entity.

"Closing" shall mean the consummation of the transactions contemplated by this Agreement.

"Closing Date" shall mean the later of (i) the Business Day that is one (1) day after the date that all the conditions to Closing described in Article VIII and Article IX hereof have been fully satisfied or waived by the appropriate party or (ii) such other date as the Purchaser and the Seller may mutually agree upon.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Committee" shall mean any Official Committee of Unsecured Creditors appointed in the Bankruptcy Case by the United States Department of Justice, Office of the United States Trustee.

"Contract" shall mean each existing instrument, contract, license and other agreement, including real property leases, operating leases, capital leases, unexpired leases of personal property and other leases, in each case directly relating to the Business, to which any Seller is a party or by which it or any of the Transferred Assets is bound which has not been previously assigned or rejected by any Seller.

"Deposit" shall have the meaning ascribed to such term in Section 2.06 hereof.

"DIP Financing" shall mean any financing provided by Purchaser to Seller, including, but not limited to, financing provided in accordance with an order of the Bankruptcy Court approving to extension of credit by Purchaser to Seller during the pendency of the Bankruptcy Case.

"Drop Dead Date" shall have the meaning ascribed to such term in Section 11.01(e) hereof.

"Effective Time" shall mean 12:01 a.m. on the Closing Date.

"Environmental Laws" means any federal, state, local or foreign law (including common law), treaty, judicial decision, regulation, rule, judgment, order, decree, injunction, permit or governmental restriction or any agreement with any governmental authority or other third party, whether now or hereafter in effect, relating to the environment, human health and safety or to pollutants, contaminants, wastes or chemicals or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substances, wastes or materials.

"Excluded Assets" means any asset that is not a Transferred Asset, including without limitation, the following:

(a) Corporate minute books, stock ledgers, stock transfer records, and any other corporate records that are not related to the Transferred Assets or that relate solely to the Excluded Assets or Unassumed Liabilities, if any;

(b) Any claims against third parties not constituting or associated with the Purchased Assets, including, without limitation, claims that the Seller may have and that may arise under Chapter 5 of the Bankruptcy Code;

(c) Any federal, state, local and foreign tax refunds, credits or benefits or income tax attributes of Seller pertaining to or arising out of periods prior to the Closing Date;

(d) All allocable prepayments including prepayments made with regard to insurance policies not assumed by the Purchaser pertaining to or arising out of periods prior to the Closing Date;

(e) All other records unrelated to the Transferred Assets;

(f) Except as otherwise provided in this Agreement, all insurance policies and their proceeds related to the Transferred Assets pertaining to or arising out of the period prior to the Closing Date;

(g) The Seller's federal taxpayer identification number;

(h) All contracts not assumed by Seller and assigned to Purchaser;

(i) Copies of all Books and Records relating to the conduct of the Business prior to the Closing Date;

(j) The Rights of the Seller under this Agreement.

(k)   Assets maintained in connection with the Seller's employee benefit plans; and

(l)   Any cash on hand or cash on deposit as of the Closing Date.

(m)   Any property subject to liens held by either GE Capital or TCF Equipment Finance, which consists of one Kodak EMS Business Software, One Kodak EMS Software Maintenance, One InSite Storefront together with all attachments and accessories thereto and one (1) 2000 Komori Lithrone Model L840-111 Series 45, 28x"40" eight color offset sheetfed press with coater type V, and all standard features and accessories S/N 2014 together with all accessories, replacements and substitutions thereto.

"Excluded Liabilities" shall have the meaning ascribed to such term in Section 2.05 hereof.

"Execution Date" shall have the meaning ascribed to such term in the preamble to this Agreement.

"Executory Contracts" shall mean all Contracts to which Seller is a party that constitute "executory contracts" as such term is used in Section 365 of the Bankruptcy Code.

"Expense Reimbursement" means Seller's reimbursement of Purchaser's reasonable documented costs and expenses in the amount of Seventy-Five Thousand Dollars ($75,000) incurred in connection with this Agreement and the transaction contemplated hereby including without limitation attorney's fees.

"Governmental Authority" shall mean any foreign, federal, state, local or other governmental, administrative or regulatory authority, body, agency, court, tribunal or similar entity including any arbitrator or arbitration panel, including, without limitation, the Bankruptcy Court.

"Knowledge" means (i) with respect to Seller, the actual knowledge, without independent investigation, of each of the executive officers of Seller, and (ii) with respect to the Purchaser, the actual knowledge, without independent investigation, of each officer of Purchaser.

"Law" shall mean any law, statute, rule, regulation, ordinance, standard, requirement, administrative ruling, order or process promulgated by any Governmental Authority as in effect from time to time (including, without limitation, any zoning or land use law or ordinance, building code, Environmental Law, securities, blue sky, civil rights or occupational health and safety law or regulation and any court, administrative agency or arbitrator's order or process).

"Liability" shall mean any debt, liability, commitment and guaranty, warranty or obligation of any kind, character or nature whatsoever, whether known or unknown, secured or unsecured, accrued, fixed, absolute, potential, contingent or otherwise, and whether due or to become due.

"Lien" shall mean any mortgage, pledge, security interest, encumbrance, claim, interest, lien or charge.

"Material Adverse Change" shall mean a material adverse change in (i) the Transferred Assets, (ii) the properties, business, results of operations or condition of the Seller, (iii) the ability of the Seller to consummate the Proposed Transaction contemplated by this Agreement or (iv) the ability of the Purchaser or the Purchaser's Affiliates to operate the Transferred Assets of the Seller (other than the Excluded Assets) after the Closing Date in substantially the same manner as they were operated prior to the occurrence of a Material Adverse Change of the type described in clauses (i) and (ii) above; provided, however, that any material adverse change resulting from (a) changes in the printing industry generally (which changes do not affect the Transferred Assets disproportionately), (b) changes in the economy generally in the United States (which changes do not affect the Transferred Assets disproportionately), or (c) changes directly caused by the transactions contemplated by this Agreement, shall not constitute a Material Adverse Change.

"Permitted Exceptions" means imperfections of title, restrictions or encumbrances, if any, that (a) with respect to all of the Transferred Assets, do not materially impair the use and operation of such asset in the Business as currently conducted or (b) are caused solely by the Purchaser.

"Person" shall mean any individual, general or limited partnership, corporation, limited liability company, association, business trust, joint venture, Governmental Authority, business entity or other entity of any kind or nature.

"Proposed Transaction" shall have the meaning ascribed to such term in the recitals to this Agreement.

"Purchase Price" shall have the meaning ascribed to such term in Section 2.06 hereof.

"Purchaser" shall have the meaning ascribed to such term in the preamble to this Agreement.

"Representative" shall mean, with respect to a Person, any employee, officer, director, stockholder, partner, accountant, attorney, investment banker, broker, finder, investor, subcontractor, consultant or other authorized agent or representative of such Person.

"Sale Approval Order" shall have the meaning ascribed to such term in the recitals to this Agreement. The Sale Approval Order, a proposed form of which is attached hereto as Exhibit C, shall be in form and substance reasonably satisfactory to the Purchaser and Seller with such changes as deemed by the parties as being reasonably acceptable.

"Schedules" means the schedules annexed hereto and made a part hereof.

"Seller" shall have the meaning ascribed to such term in the preamble to this Agreement.

"Tax" shall mean any federal, state, province, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits,

environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return" shall mean any return, report, declaration, claim for refund, estimate, election, or information statement or return relating to any Tax, including any schedule or attachment thereto, and any amendment thereof.

"Transfer" shall mean any sale, transfer, conveyance, assignment, delivery or other disposition, and "Transfer" or "Transferred," used as a verb, shall each have a correlative meaning.

"Transferred Assets" shall have the meaning ascribed to such term in Section 2.01 hereof.

Section 1.02      Additional Definitions.

In addition to the foregoing defined terms, other capitalized terms appearing in this Agreement shall have the respective meanings ascribed to such terms where they first appear in the text of this Agreement.

Section 1.03      Headings.

The headings contained in this Agreement are for convenience of reference only and shall not constitute a part hereof or define, limit or otherwise affect the meaning of any of the terms or provisions hereof.

Section 1.04      Schedules.

Unless the context otherwise requires, all capitalized terms used in the Schedules shall have the respective meanings assigned in this Agreement.  No reference to or disclosure of any item or other matter in the Schedules shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in the Schedules.  No disclosure in the Schedules relating to any possible breach or violation of any agreement, law or regulation shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.  Any information, item or other disclosure set forth in any Schedule shall be deemed to have been set forth in all other applicable Schedules if the relevance of such disclosure to such other Schedules is reasonably apparent from the facts specified in such disclosure.

Section 1.05      References to Articles, Etc.

All references herein to Articles, Sections, Exhibits and Schedules shall be to Articles and Sections of and Exhibits and Schedules to this Agreement.

Section 1.06        References to "Herein," Etc.

As used in this Agreement, the words "herein," "hereof," "hereby" and "hereunder" shall refer to this Agreement as a whole, and not to any particular section, provision or subdivision of this Agreement.

## ARTICLE II.

## PURCHASE AND SALE OF THE ASSETS; PURCHASE PRICE

Section 2.01        Purchase and Sale of the Assets.

At and as of the Effective Time, the Seller shall Transfer to the Purchaser, and the Purchaser shall purchase and accept from the Seller, free and clear of all Liens, other than Assumed Liabilities and Permitted Exceptions, to the maximum extent provided in the Sale Approval Order, all of the Seller's right, title and interest in and to those assets described with particularity on Schedule 2.01 hereto, together with any and all underlying source and object codes, Books and Records, intellectual property, warranties of third parties, whether in written, recorded, or encoded form, as directly relate to such assets or the operation of the Business directly related to such assets, which were owned by Seller but not sold by the Seller prior to the Closing and all rights of Seller under the Assigned Contracts (collectively, the "Transferred Assets").

Section 2.02        Excluded Assets.

The Seller shall retain all of their right, title and interest in and to the Excluded Assets.

Section 2.03        Assumption of Liabilities.

Subject to the terms and conditions of this Agreement, at and as of the Effective Time, the Purchaser shall assume and agree to pay, perform, discharge and satisfy when due in accordance with their terms the following Liabilities arising after the Effective Time:

(a)    Liabilities under any of the Assigned Contracts included in the Transferred Assets accruing, arising out of or relating to periods after the Effective Time;

(b)    Any amount which may be payable pursuant to Section 365(b) of the Bankruptcy Code on account of the assumption and assignment of any Assigned Contract (a "Cure Amount"); provided, however, that in the event any Cure Amount with respect to any Assigned Contract is greater than zero dollars, Purchaser shall use its commercially reasonable best efforts to inform the Seller two (2) days prior to the first Bankruptcy Court hearing scheduled to approve the transactions contemplated by this Agreement which of the Assigned Contracts it intends to have the Seller assume and assign to the Purchaser;

(c)    Liabilities arising out of or relating to, either directly or indirectly, the Transferred Assets accruing, arising out of, or relating to periods after the Effective Time;

(d)    Any cost arising from or relating to the provision of adequate assurance of future performance, which shall be the sole responsibility of the Purchaser, with respect to any of the Assigned Contracts;

(e)    Any Liabilities after the Effective Time covered by warranties assigned to the Purchaser pursuant to Section 2.01 of this Agreement; and

(The Liabilities described in the foregoing clauses (a), (b), (c), (d), and (e) are collectively defined herein as the "Assumed Liabilities").

Section 2.04    Cure Amounts.

At the Closing, Purchaser shall pay all Cure Amounts due except INS, LLC lease with respect to any Assigned Contract.  At Closing, Purchaser shall at its expense also cure all non-monetary defaults with respect to the Assigned Contracts as required by Section 365 of the Bankruptcy Code.

Section 2.05    Excluded Liabilities.

Purchaser shall not assume or be obligated for or be responsible to pay, perform, satisfy or otherwise discharge any Liabilities whatsoever of Seller that are not assumed by Purchaser pursuant to this Agreement (collectively, the "Excluded Liabilities").

Section 2.06    Purchase Price.

In consideration for the Transferred Assets, the Purchaser shall pay to the Seller by bank or certified check or wire transfer of immediately available funds One Million Five Hunderd Fifty Thousand Dollars (US $1,550.000) (the "Purchase Price"), provided, however, that the Purchaser may apply against the Purchase Price, and deduct from the cash consideration paid at Closing, an amount equal to any balance of the DIP Financing outstanding as of the Closing Date.  Upon the execution and delivery of this Agreement by the parties hereto, the Purchaser shall deliver $75,000 of the Purchase Price to Seller to be held by Seller's counsel as a deposit (the "Deposit") pursuant to the terms of an escrow agreement a copy of which is attached hereto as Exhibit D.  If the Deposit is not delivered within two (2) business days after the execution hereof, then Seller may at its option terminate this Agreement by notice to Purchaser, whereupon neither party shall have any further obligations hereunder. Upon termination of this Agreement for any reason other than as set forth in the following sentence, immediately following such termination, Seller's counsel shall return the Deposit to the Purchaser.  If this Agreement is terminated by Seller pursuant to Section 11.01(c) hereof, the Deposit shall be provided to the Seller and shall not be returnable to the Purchaser.  Seller's right to receive the Deposit under such circumstances shall be without prejudice to any rights Seller may have to be compensated in full for any damages which they may have suffered as a result of any breach of this Agreement by the Purchaser.

Section 2.07    Purchase Price Allocation.

The Purchase Price shall be allocated among the Transferred Assets as provided in a schedule mutually prepared by Purchaser and Seller (the "Allocation") for purposes of

complying with the requirements of Section 1060 of the Code and regulations thereunder. The Purchaser and the Seller agree to use such Allocation in filing all required forms under Section 1060 of the Code and not take any position inconsistent with such Allocation upon any examination of any such Tax Return, in any refund claim or in any tax litigation. In addition, (i) neither the Seller nor the Purchasers make any admission or agreement that such allocation in any way establishes, determines or represents the actual value or appraisal of any of the Seller or the Transferred Assets and (ii) the allocation shall not be binding upon, nor shall it express or imply any agreement, conclusion or determination of value by or among, any secured or unsecured creditor of the Seller.

~~Section 2.08          Expense Reimbursement.~~

~~After the execution and delivery of the Agreement, in the event that the Purchaser is not the successful bidder to purchase the Transferred Assets as a result of the Seller receiving a higher or better offer from another bidder, the Expense Reimbursement shall be awarded to the Purchaser all in accordance with the terms of any bidding and sale procedures order entered by the Bankruptcy Court. It is expressly acknowledged that such Expense Reimbursement (i) shall only be awarded upon consummation of the sale of the Transferred Assets to another party submitting a higher and better offer than the Purchaser in accordance with the bidding procedures approved by the Bankruptcy Court relating to the transactions contemplated herein and (ii) shall be payable only from the proceeds of such sale. The Expense Reimbursement described herein shall have super priority administrative claim status in the Bankruptcy Case pursuant to Section 507(b) of the Bankruptcy Code, senior to all super priority expense claims.~~

Section 2.09          Further Solicitations.

Purchaser and the Seller acknowledge that the officers and directors of the Seller have duties under applicable Law to realize the highest and best offer for the assets and business of the Seller. Subject to the duties and responsibilities of the Seller and its respective officers and directors under applicable Law, including applicable bankruptcy law, the Seller has entered into this Agreement and agree further that with respect to the Transferred Assets, until entry of the Sale Approval Order, Seller retains the right to solicit competing offers; including continuing discussions and negotiations with parties with whom the Seller or its representatives have had communication prior to the date hereof as well as continuing to solicit new bidders to bid on the Transferred Assets. Moreover, until entry of the Sale Approval Order, the Seller retains the right to (A) furnish information to, cooperate with, and facilitate offers received from, competing bidders, (B) negotiate definitive documents and purchase agreements with competitive bidders, as contemplated by any bidding procedures order entered by the Bankruptcy Court, and (C) determine in its sole and absolute discretion, consistent with any such bidding procedures order, which bid(s), if any, to recommend to the Bankruptcy Court for approval. On entry of the Sale Approval Order authorizing the sale of the Transferred Assets and the Assigned Contracts to Purchaser, the Seller shall not, and shall cause each of its respective officers, directors, advisors, employees, agents and Affiliates not to, solicit, initiate or engage in any discussions with any other Person regarding, or enter into any agreement with any other Person with respect to, the proposed sale of the Transferred Assets (all to the extent approved for sale to the Purchaser), other than with the Purchaser subject to any order of the Bankruptcy Court.

ARTICLE III.

THE CLOSING

Section 3.01          Time and Place of Closing.

If all the conditions to Closing set forth in this Agreement have been satisfied or waived in writing prior to such date, the Closing shall take place at 10:00 a.m., prevailing Eastern time, on the Closing Date at the offices of Gunderson Dettmer Stough Villeneuve Franklin & Hachigian, LLP, 610 Lincoln Street, Waltham, MA 02451, or at such other time or place as may be mutually agreed upon by the parties hereto.  The Closing, the Transfer of the Transferred Assets, the effectiveness of the documents, agreements and certificates delivered in accordance with this Agreement, and the consummation of the transactions contemplated hereby shall be deemed to occur at the Effective Time.

Section 3.02          Deliveries at Closing.

(a)    Deliveries by Purchaser.  At the Closing, the Purchaser shall deliver to the Seller the following:

(i)    wire transfer of the cash portion of the Purchase Price (less the amount of the Deposit held by Seller's counsel);

(b)    Deliveries by the Seller.  At the Closing, the Seller shall deliver to the Purchaser the following:

(i)    the Bill of Sale;

(ii)    the Assignment and Assumption Agreement;

(iii)    such other documents as Purchaser's counsel may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement and vest in Purchaser good and valid title to the Transferred Assets.

Section 3.03          Delivery of the Transferred Assets.

At the Closing, the Seller shall make available to the Purchaser, at a location identified by the Seller, all Transferred Assets not otherwise transferred through the Assignment and Assumption Agreement.

Section 3.04          Sales, Use and Other Taxes.

Any sales, use, purchase, transfer, stamp, or documentary stamp Taxes which may be payable by reason of the sale of the Transferred Assets, under this Agreement for the transactions contemplated herein and any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such Taxes, shall be the responsibility and obligation of and timely paid by the Purchaser.  In no event shall any party to this Agreement be responsible for the

income taxes of any other party that arise as a consequence of the transactions consummated hereunder.

## ARTICLE IV.

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

As an inducement to the Purchaser to enter into this Agreement, the Seller represents and warrants as of the date hereof and as of the Closing Date as follows:

Section 4.01          Organization.

Seller is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation and except as affected by the pendency of the Bankruptcy Case, has the requisite power and authority to own, operate and lease its properties and assets and to conduct the Business as it is now being owned, operated, leased and conducted.

Section 4.02          Power and Authority.

(a)     Seller has the requisite corporate power and authority to execute and deliver this Agreement and the other Acquisition Documents to which it is a party and, subject to the entry of the Sale Approval Order by the Bankruptcy Court, perform its obligations hereunder and thereunder and consummate the transactions contemplated hereby and thereby;

(b)     The execution and delivery by Seller of this Agreement and the other Acquisition Documents to which it is a party, the performance of its obligations hereunder and thereunder and the consummation by it of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate actions on the part of Seller and by the Bankruptcy Court, subject to the entry of the Sale Approval Order; and

(c)     Subject to the entry of the Sale Approval Order by the Bankruptcy Court, this Agreement and each other Acquisition Document to which Seller is a party will constitute, upon the mutual execution and delivery thereof, the legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and similar laws relating to or affecting creditors generally and by general equity principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 4.03          Approvals.

Except (i) as set forth on Schedule 4.03, (ii) for Approval of the Bankruptcy Court, (iii) for any consents required to assign any Assigned Contract, no Approval of any Governmental Authority or other Person is required to be made, obtained or given by or with respect to the Seller in connection with the execution or delivery by Seller of this Agreement and the other

Acquisition Documents to which it is a party, the performance by Seller of its obligations hereunder or thereunder or the consummation by Seller of the transactions contemplated hereby or thereby, except for any such Approval which could not adversely impact the Seller's ability to perform their obligations under this Agreement.

Section 4.04      Broker's or Finder's Fees.

Other than as provided in any agreement entered into by the Seller and Axia Advisors that has been or may be approved by the Bankruptcy Court, the Seller has not authorized any Person to act as broker, finder, banker, consultant, intermediary or in any other similar capacity which would entitle such Person to any investment banking, brokerage, finder's or similar fee in connection with the transactions contemplated by this Agreement or any of the other Acquisition Documents. Any such fees shall solely be the obligation of the Seller.

Section 4.05      Taxes.

Seller has filed, and will continue to file with respect to the Transferred Assets through the Closing Date, all Tax Returns which are required to be filed by Seller with respect to the Transferred Assets. Seller has not executed or filed with the Internal Revenue Service or with any state or local taxing authorities any agreement extending, or having the effect of extending, the periods for assessment and collection of any Taxes relating to the Transferred Assets. There is no action, suit, investigation, audit, claim or assessment pending or, to the knowledge of Seller, threatened with respect to Taxes relating to any Transferred Assets. None of the Transferred Assets is subject to any Tax Liens (other than Liens for Taxes relating to the Transferred Assets which are not yet due and payable).

Section 4.06      Title to Transferred Assets.

Seller has good and valid title to, or in the case of leaseholds, valid leasehold interests in, all of the Transferred Assets. Upon the execution and delivery to Purchaser on the Closing Date of the Bill of Sale, the Assignment and Assumption Agreement and any other instruments of transfer and assignment contemplated by this Agreement, and subject to the entry of a Sale Approval Order by the Bankruptcy Court, Seller will transfer to Purchaser good and valid title to the Transferred Assets, in each case free and clear of all Liens and claims.

Section 4.07      Litigation.

Except for the Bankruptcy Case and proceedings pending therein, there is no litigation, action, lawsuit, claim, audit, review, examination, inquiry, proceeding or investigation pending or, to the Knowledge of the Seller, threatened against Seller which relates to the Transferred Assets which, if adversely determined, would reasonably be expected, individually or in the aggregate, to have a Material Adverse Change. There is no litigation, action, lawsuit, claim, audit , review, examination, inquiry, proceeding or investigation involving Seller pending or, to the Knowledge of Seller, threatened which questions the legality or propriety of the transaction contemplated by this Agreement or any of the Acquisition Documents. Except for orders or other proceedings in the Bankruptcy Case, there is no outstanding order, writ, injunction, or decree of any Governmental Authority against Seller that would have a Material Adverse Change.

Section 4.08       Intellectual Property.

(a)       "Intellectual Property" means all of the following as they exist in all jurisdictions throughout the world, in each case, to the extent used in the operation of the Transferred Assets and owned by, licensed to, authorized for use by, or otherwise used by Seller:

(i)       patents, patent applications, and other patent rights (including any divisions, continuations, continuations-in-part, substitutions, or reissues thereof, whether or not patents are issued on any such applications and whether or not any such applications are modified, withdrawn, or resubmitted);

(ii)       trademarks, trade dress, trade names, brand names, designs, logos, or corporate names, whether registered or unregistered, and all registrations and applications for registration thereof;

(iii)       copyright registrations and applications for registration thereof and non-registered copyrights;

(iv)       trade secrets, designs, research, processes, procedures, technique, methods, know-how, data, mask works, inventions. and other proprietary rights (whether or not patentable or subject to copyright, mask work, or trade secret protection); and

(v)       computer software programs including all source codes, object codes, and material documentation related thereto.

(b)       Administration and Enforcement.  Except as would not reasonably be expected to result in a Material Adverse Change, Seller has taken all necessary action to maintain and protect each material item of Intellectual Property owned by Seller included in the Transferred Assets.

(c)       Other Intellectual Property Representations and Warranties.  There have been no claims made against the Seller asserting the invalidity, misuses or unenforceability of the Transferred Assets, and the Seller is not aware of any valid grounds for the same.  Seller has not received any notices of, and is not aware of any facts which indicate a likelihood of, any infringements or misappropriation by, or conflict with, any third party with respect to the Transferred Assets (including, without limitation, any demand or request that the Seller license any rights from a third party).  Seller does not believe it is or will be necessary to utilize any inventions of any of its employees (or people it currently intends to hire) made prior to their employment by Seller, except for inventions that already have been assigned or licensed to the Seller.

Section 4.09       Compliance With Applicable Laws.

Seller is in compliance with all applicable Laws relating to the ownership or use of the Transferred Assets, except where failure to comply individually or in the aggregate would not reasonably be expected to have a Material Adverse Change.

ARTICLE V.

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

As an inducement to Seller to enter into this Agreement, Purchaser hereby represents and warrants as of the date hereof and as of the Closing Date as follows:

Section 5.01        Organization and Good Standing.

Purchaser is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation and has the requisite power and authority to own, operate and lease its properties and assets and to conduct its business as they are now being owned, operated, leased and conducted. Purchaser is, or prior to Closing, will be duly qualified or licensed to do business as a foreign (corporation) and is in good standing in every jurisdiction where such qualification is material to the Business.

Section 5.02        Power and Authority.

The Purchaser has the requisite (corporate) power and authority to execute and deliver this Agreement and the other Acquisition Documents, perform its obligations hereunder and thereunder; consummate the transactions contemplated hereby and thereby and carry on the Business as currently conducted. The execution and delivery by the Purchaser of this Agreement and the other Acquisition Documents to which it is a party, the performance by it of its obligations hereunder and thereunder and the consummation by it of the transactions contemplated hereby and thereby have been duly authorized by all necessary (corporate) actions on the part of the Purchaser. This Agreement and each other Acquisition Document to which the Purchaser is a party will constitute upon the mutual execution and delivery thereof the legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms, except as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity.

Section 5.03        No Violation.

Neither the execution and delivery of this Agreement, the instruments of assumption and undertaking and the other documents delivered or to be delivered by Purchaser pursuant hereto and the performance by Purchaser hereunder and thereunder nor the consummation of the transactions contemplated hereby and thereby will materially violate, conflict with, result in the breach of or accelerate the performance required by any of the terms, conditions or provisions of the Certificate of Incorporation, By-laws or other constitutional document of Purchaser or any order, ruling, decree, judgment, arbitration aware or stipulation to which Purchaser is subject, or constitute a default thereunder.

Section 5.04        Approvals.

Other than Approval by the Bankruptcy Court, no Approval of any Governmental Authority or other Person is required to be made, obtained or given by or with respect to the Purchaser in connection with the execution or delivery by it of this Agreement and the other

Acquisition Documents, the performance by it of its obligations hereunder or thereunder or the consummation by it of the transactions contemplated hereby or thereby, except for any such Approval which could not adversely impact the Purchaser's ability to perform its obligations under this Agreement.

Section 5.05          Availability of Funds.

Purchaser (i) has, and at the Closing will have, sufficient funds available to pay the Purchase Price and any expenses, including without limitation the Cure Amounts, incurred by Purchaser in connection with the transactions contemplated by this Agreement and (ii) has not incurred any obligation, commitment, restriction or Liability of any kind that would impair or adversely affect Purchaser's capability to perform its obligations under this Agreement.

Section 5.06          Broker's or Finder's Fees.

Neither the Purchaser nor any of its Affiliates has authorized any Person to act as broker, finder, banker, consultant, intermediary or in any other similar capacity which would entitle such Person to any investment banking, brokerage, finder's or similar fee in connection with the transactions contemplated by this Agreement or any of the other Acquisition Documents, except where any fee or payment due such persons would be solely the obligation of the Purchaser or its Affiliates. Purchaser hereby agrees to indemnify and hold harmless the Seller and the Seller's estates with respect to any Liabilities associated with any such fees.

Section 5.07          Litigation.

There is no action, claim, suit, arbitration, inquiry, subpoena, discovery request, proceeding or investigation, at law or in equity, or threat thereof, by or before any court or grand jury, any governmental or other regulatory or administrative agency or commission or any arbitration tribunal, pending or, to the Purchaser's Knowledge, threatened against the Purchaser or any of its subsidiaries or affiliates seeking to delay or enjoin the consummation of the transactions contemplated herein.

## ARTICLE VI.

## COVENANTS OF THE SELLER

Section 6.01          Satisfaction of Conditions.

From and after the date hereof until the Closing Date, Seller will, and will use its reasonable best efforts to cause each of its Affiliates to, use its reasonable best efforts to perform, comply with and fulfill all obligations, agreements, covenants and conditions required by this Agreement to be performed, complied with or fulfilled by any of them prior to or as of the Closing Date.

Section 6.02          Conduct by Seller Pending the Closing.

Except as otherwise expressly contemplated under this Agreement, from the date hereof until the Closing Date, without the prior written consent of the Purchaser:

(a)    Seller shall not adopt or propose any change in its certificate of incorporation or bylaws or similar organizational instrument, except a change that would not have any adverse effect on the Proposed Transaction;

(b)    Seller shall not lease, license, surrender, relinquish, encumber, or dispose of any Transferred Assets;

(c)    Seller shall not terminate, amend, modify or supplement the terms of any Assigned Contracts without the express written permission of Purchaser;

(d)    Seller shall not agree or commit to do any of the foregoing; and

(e)    except to the extent necessary to comply with the requirements of applicable laws, regulations or Bankruptcy Court orders, Seller shall not (i) take, agree, or commit to take, any action that would make any representation or warranty of Seller hereunder materially inaccurate in any respect at, or as of any time prior to, the Closing Date, (ii) omit, or agree or commit to omit, to take any action necessary to prevent any such representation or warranty from being materially inaccurate in any respect on the Closing Date, or (iii) take, agree, or commit to take, any action that would result in, or is reasonably likely to result in, any of the conditions set forth in Articles VIII and IX not being satisfied.

Section 6.03    Access and Information.

Seller shall afford to the Purchaser and to the Purchaser's financial advisors, legal counsel, accountants, consultants, financing sources, and other authorized representatives reasonable access during normal business hours and without material disruption to the business or operations of Seller throughout the period prior to the Closing Date to all their books, documents, records, properties, plants, and personnel that relate to the Transferred Assets or Assumed Liabilities, and all other information as the Purchaser reasonably may request in furtherance of the Proposed Transaction.

Section 6.04    Filings; Other Action.

Subject to the terms and conditions herein provided, as promptly as practicable, Seller and the Purchaser shall (a) use commercially reasonable efforts to cooperate with each other in (i) determining which filings are required to be made prior to the Closing Date with, and which material consents, approvals, permits, or authorizations are required to transfer the Transferred Assets from, Governmental Authorities of the United States and the several states or the District of Columbia, and foreign jurisdictions in connection with the execution and delivery of this Agreement and the consummation of the Proposed Transaction, and (ii) timely making all such filings and timely seeking all such consents, approvals, permits, or authorizations, and (b) use commercially reasonable efforts to take, or cause to be taken, all other action and do, or cause to be done, all other things reasonably necessary or appropriate to consummate the Proposed Transaction, as soon as practicable. In connection with the foregoing, Seller will promptly provide the Purchaser, and the Purchaser will promptly provide Seller, with copies of all correspondence, filings, or communications (or memoranda setting forth the substance thereof)

between such party or any of its representatives, on the one hand, and any Governmental Authority or members of their respective staffs, on the other hand, with respect to all filings and submissions required hereunder.  The Parties hereto acknowledge that certain actions may be necessary with respect to the foregoing in making notifications and obtaining clearances, consents, approvals, waivers, or similar third-party actions that are material to the consummation of the Proposed Transaction, and each party agrees to take commercially reasonable actions to complete such notifications and obtain such clearances, approvals, waivers, or third-party actions; provided, however, that nothing in this Agreement shall require any party to take any action or accept or comply with any condition that could reasonably be expected to result in a Material Adverse Change or require the Purchaser to dispose of any of its assets; provided, further, that Seller will take any such action if the Purchaser has (i) so requested in writing and (ii) waived any claim, right and condition the Purchaser would otherwise be entitled to under this Agreement in connection therewith.  The Purchaser and Seller agree that, except as otherwise expressly contemplated by this Agreement, they will not take any action that would reasonably be expected to materiality adversely affect or materially delay the Closing or the ability of any of the Parties to satisfy any of the conditions to the Closing or to consummate the Proposed Transaction.

Section 6.05          <u>Bankruptcy Actions</u>.

     (a)          Seller shall, in accordance with all applicable requirements of, and procedures under, the Bankruptcy Code (i) upon the filing of the Bankruptcy Case, file with the Bankruptcy Court a motion (the "<u>Sales Procedures Motion</u>") seeking approval of the Sale Procedures Order (as defined below) and a motion (the "<u>Sale Motion</u>") seeking approval of the Sale Approval Order and thereafter take all actions as may be reasonably necessary to cause such Sale Procedures Order and Sale Approval Order to be issued, entered and become final orders and (ii) timely serve copies of the notices setting forth the hearing date on the Sale Procedures Order and the Sale Approval Order upon any and all parties in interest entitled or required to receive notice under all applicable laws, rules and regulations and orders of the Bankruptcy Court prior to the hearing on such motions (all such motions and actions relating to the Sale Procedures Order and the Sale Approval Order will be in form and substance reasonably satisfactory to Purchaser).

     (b)          Seller shall use commercially reasonable efforts so that the Bankruptcy Court enters a Sales Procedures Order, which, as entered by the Bankruptcy Court, is in a form reasonably acceptable to Purchaser's counsel, that, among other things: (i) names Purchaser as the "stalking horse" with respect to the Transferred Assets, (ii) requires the payment of the Expense Reimbursement under the circumstances and in accordance with the terms of this Agreement, (iii) provides for the Seller's solicitation of additional bids ("overbids"), (iv) requires that any party submitting an overbid provide written evidence reasonably satisfactory to the Seller demonstrating that such bidder has the financial ability to consummate the purchase of all of the Transferred Assets and the assumption of all of the Assumed Liabilities, (v) requires that any party submitting an overbid provide an executed copy of a definitive sale document having, with the exception of the Purchase Price, terms and conditions no less favorable than those contained in this Agreement, accompanied by a redline showing the changes made to the Agreement, (vi) requires that any overbid excel the cash consideration provided in this Agreement by at

least Twenty-Five Thousand Dollars ($25,000), (vii) requires that any qualified bid, other than Purchaser's bid pursuant to this Agreement, be delivered to the Seller on or before the deadline established by the Bankruptcy Court, (viii) permits the Purchaser to credit bid the amount of the Expense Reimbursement and to credit bid the amount of any outstanding obligations of the Debtor to the Purchaser under the DIP Financing, (ix) authorizes and directs the Seller without further Bankruptcy Court notice, action or order to pay the Expense Reimbursement and to return the Deposit at the times provided in this Agreement (and in accordance with the Escrow Agreement), (x) provides that the Purchaser shall have an allowed super-priority administrative expense priority claim (which shall be senior to any and all claims of any creditors of the Seller, including the pre-petition and post petition secured lenders and any court appointed professionals) for the Expense Reimbursement and (xi) provides for an open, unsealed bidding procedure to be conducted at the premises housing the Bankruptcy Court to determine which of the bidders, including the Purchaser, is the highest and best bid entitled to Purchase the Transferred Assets (the "Sales Procedures Order").

(c)    Seller shall use commercially reasonable efforts so that the Bankruptcy Court approves the Sale Approval Order, which shall contain provisions, among other things, (a) approving the sale of the Transferred Assets to Purchaser on the terms and conditions set forth in this Agreement, (b) stating that any objections timely filed with respect to the sale of the Transferred Assets, which have not been withdrawn, are overruled or the interests of such objections have been otherwise satisfied or adequately provided for by the Bankruptcy Court, (c) finding that Purchaser is a good faith purchaser of the Transferred Assets under Section 363(m) of the Bankruptcy Code and that the provisions of Section 363(n) of the Bankruptcy Code are not applicable to Purchaser's purchase of the Purchased Assets, (d) providing that the sale of the Transferred Assets to Purchaser shall be free and clear of any and all Liens, other than the Permitted Exceptions, under Section 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code, (e) providing that the Bankruptcy Court shall retain jurisdiction for the purpose of enforcing the provisions of the Sale Approval Order including, without limitation, compelling delivery of the Transferred Assets to Purchaser and protecting Purchaser against any Liens, claims, interests, obligations and encumbrances against Seller or the Transferred Assets, (f) providing that, except as otherwise provided herein, including but not limited to, in Section 3.04, any Liens, claims, interests, liabilities, obligations, encumbrances, charges and interests of any kind asserted under laws, rules, regulations or governmental or court orders imposing a stamp tax, transfer tax or similar tax arising from the transfer of the Transferred Assets to Purchaser or any sales tax and any other taxes of the Seller relating to a pre-Closing period (collectively, "Seller Taxes") shall be filed against the estate and shall not be asserted against Purchaser, (g) approving the assignment and assumption of the Assigned Contracts (h) providing that the parties hereto shall be authorized to close this transaction immediately upon execution of the Sale Approval Order pursuant to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure, (i) authorizing and directing Seller to execute, deliver, perform under, consummate and implement this Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing, and (j) determining that Purchaser is not a successor to Seller or otherwise liable for any of the Excluded Liabilities or Excluded Assets and permanently enjoining

all persons and entities from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, cause of action or Lien against Purchaser or the Purchased Assets.

(d)     Purchaser agrees to cooperate with Seller in connection with furnishing information pertaining to the satisfaction of the requirement of adequate assurances of future performance of the Assumed Contracts as required under Section 365 of the Bankruptcy Code.

Section 6.06        Tax Returns and Filings; Payment of Taxes.

Seller and Purchaser shall cooperate with respect to Tax matters. Seller shall provide the Purchaser with such Tax information and copies of such Tax Returns (in each case, relating to the Transferred Assets) as the Purchaser may reasonably request, reasonably promptly after such request.

Section 6.07        Additional Matters.

Subject to the terms and conditions herein provided, each of the parties hereto agrees to use commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper, or advisable under applicable laws and regulations to consummate and make effective the Proposed Transaction, including using commercially reasonable efforts to obtain all necessary waivers, consents, and approvals in connection with the requirements of any Governmental Authorities and to effect all necessary registrations and filings.

ARTICLE VII.

COVENANTS OF THE PURCHASER

The Purchaser hereby covenants and agrees that, except as otherwise consented to in writing by the Seller, from and after the Execution Date until the Closing:

Section 7.01        Notification of Certain Matters.

The Purchaser shall give prompt notice to the Seller and the Committee of (i) the occurrence or nonoccurrence of any event the occurrence or nonoccurrence of which would be likely to cause any representation or warranty contained in this Agreement to be materially untrue or inaccurate, (ii) any failure of the Purchaser to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it hereunder and (iii) the occurrence or nonoccurrence of any event the occurrence or nonoccurrence of which is or would reasonably be expected to result in a material adverse change in the ability of the Purchaser to consummate the Proposed Transaction; provided, however, that the delivery of any notice pursuant to this Section 7.01 shall not limit or otherwise affect the remedies available hereunder to the party receiving such notice.

Section 7.02        Satisfaction of Conditions.

From and after the date hereof until the Closing Date, the Purchaser will, and will use its reasonable best efforts to cause each of its Affiliates to, use its reasonable best efforts to perform, comply with and fulfill all obligations, agreements, covenants and conditions required by this Agreement to be performed, complied with or fulfilled by any of them prior to or as of the Closing Date.

Section 7.03        Adequate Assurance; Reimbursement.

Purchaser shall use reasonable best efforts to assist Seller in demonstrating adequate assurance of future performance related to all Assigned Contracts.

## ARTICLE VIII.

## CONDITIONS PRECEDENT TO THE PURCHASER'S OBLIGATIONS

The obligations of the Purchaser to purchase and accept transfer and delivery of the Transferred Assets are subject to the satisfaction on or, where appropriate, prior to, the Closing Date, of the following conditions, except to the extent that any such condition may have been waived in writing by the Purchaser on or prior to the Closing Date:

Section 8.01        Representations and Warranties.

The representations and warranties of the Seller contained in Article IV of this Agreement shall have been true and correct in all material respects when made and shall be true and correct in all material respects at and as of the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date and except to the extent that such representations and warranties are already qualified by materiality, in which case such representations and warranties shall be true and correct in all respects), except, in each case, where the failure of such representations and warranties to be true and correct would not result in a Material Adverse Change.

Section 8.02        Performance.

The Seller shall have performed and complied in all material respects with the covenants and obligations required by this Agreement to be performed or complied with by the Seller at or prior to the Closing Date.

Section 8.03        No Order.

No order, statute, rule, regulation, executive order, injunction, stay, decree, directive, or restraining order shall have been enacted, entered, promulgated or enforced by any court of competent jurisdiction or Governmental Authority that would (i) prevent the consummation of any of the transactions contemplated by this Agreement or (ii) cause any of the transactions contemplated by this Agreement to be rescinded following consummation, nor shall any such injunction, judgment, order, decree, ruling or charge be in effect. No Action shall be pending before any Governmental Authority or before any arbitral body wherein an unfavorable

injunction, judgment, order, decree, ruling, directive or charge would (x) prevent consummation of any of the transactions contemplated by this Agreement or (y) cause any of the transactions contemplated by this Agreement to be rescinded following consummation; provided, however, the filing of an appeal of the Sale Approval Order by any party shall not constitute any such Action contemplated by this Section 8.03, so long as a stay of the Sale Approval Order pending appeal has not been granted.

Section 8.04        Sale Approval Order.

The Sale Approval Order shall have been entered and shall be in full force and effect on the Closing Date.

ARTICLE IX.

CONDITIONS PRECEDENT TO THE SELLER'S OBLIGATIONS

The obligations of the Seller to sell, transfer and deliver the Transferred Assets are subject to the satisfaction on or, where appropriate, prior to the Closing Date, of the following conditions, except to the extent that any such condition may have been waived in writing by the Seller on or prior to the Closing Date:

Section 9.01        Representations and Warranties.

The representations and warranties of the Purchaser contained in Article V of this Agreement shall have been true and correct in all material respects when made and shall be true and correct in all material respects at and as of the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date and except to the extent that such representations and warranties are already qualified by materiality, in which case such representations and warranties shall be true and correct in all respects), except, in each case, where the failure of such representations and warranties to be true and correct would not adversely impact the Purchaser's ability to perform its obligations under this Agreement.

Section 9.02        Performance.

The Purchaser shall have performed and complied in all material respects with the covenants and obligations required by this Agreement to be performed or complied with by the Purchaser at or prior to the Closing Date.

Section 9.03        No Order.

No order, statute, rule, regulation, executive order, injunction, stay, decree, directive, or restraining order shall have been enacted, entered, promulgated or enforced by any court of competent jurisdiction or Governmental Authority that would (i) prevent the consummation of any of the transactions contemplated by this Agreement or (ii) cause any of the transactions contemplated by this Agreement to be rescinded following consummation, nor shall any such injunction, judgment, order, ruling or charge be in effect.  No Action shall be pending

before any Governmental Authority or before any arbitral body wherein an unfavorable injunction, judgment, order, decree, ruling, directive or charge would (x) prevent consummation of any of the transactions contemplated by this Agreement or (y) cause any of the transactions contemplated by this Agreement to be rescinded following consummation.

Section 9.04    <u>Sale Approval Order.</u>

The Sale Approval Order shall have been entered and shall be in full force and effect on the Closing Date. For the avoidance of doubt, this condition shall be deemed to have been fulfilled prior to the expiration of any applicable appeal period regarding the Sale Approval Order and so long as no order has been entered granting a stay of the Sale Approval Order pending appeal.

ARTICLE X.

<u>COVENANTS AND AGREEMENTS SUBSEQUENT TO THE CLOSING</u>

Section 10.01    <u>Books and Records; Access.</u>

After the Closing Date, the Purchaser shall not destroy or otherwise dispose of any original Books and Records in its possession as of the Closing Date relating to the Business or the Transferred Assets prior to the Closing or relating to any Liabilities without first offering to surrender such Books and Records to the Seller and the Committee, upon ninety (90) days written notice and shall maintain such Books and Records in good condition in a reasonably accessible location. Upon such notice of the Purchaser's intention to destroy or otherwise dispose of any original Books and Records and the Seller or Committee's timely notification to Purchaser to take possession of such Books and Records, Seller or Committee shall have one hundred eighty (180) days thereafter to take possession of such Books and Records. In addition, after the Closing Date the Purchaser shall afford the Seller, the Committee, their (i) attorneys and (ii) representatives, successors and assigns, including, without limitation, any successor trustee, attorneys or any other person created or appointed by the Bankruptcy Court pursuant to a plan of reorganization, reasonable access to their books, records, personnel, offices and other information with respect to the Business that is necessary for the purpose of obtaining information related to the Bankruptcy Case, winding up the Bankruptcy Case, taxes and other reasonable business purposes and shall cooperate with Seller and the Committee with respect to such matters without cost or charge to the Seller.

Section 10.02    <u>Further Assurances.</u>

In addition to the actions, documents, files, pleadings and instruments specifically required to be taken or delivered by this Agreement or the other Acquisition Documents, whether on or before or from time to time after the Closing, and without further consideration, each party hereto shall make reasonable best efforts to, and shall use their reasonable best efforts to cause their respective Affiliates to, take such other actions, and execute and/or deliver such other documents, data, pleadings, files, information and instruments, as the other party hereto or its counsel may reasonably request in order to effectuate and perfect the transactions contemplated by this Agreement and the other Acquisition Documents.

## ARTICLE XI.

## TERMINATION

Section 11.01        Termination.

This Agreement may be terminated at any time prior to the Closing:

(a)        by the mutual written consent of the Purchaser and the Seller;

(b)        by the Purchaser upon written notice in the event of a material breach of any covenant or agreement to be performed or complied with by the Seller, or in the event of a material breach of any representation or warranties of the Seller, pursuant to the terms of this Agreement or any of the Acquisition Documents, which breach would result in a condition to Closing set forth in Article VIII hereof becoming incapable of fulfillment or cure (which condition has not been waived by the Purchaser in writing) prior to the Drop Dead Date;

(c)        by the Seller upon written notice in the event of a material breach of any covenant or agreement to be performed or complied with by the Purchaser, or in the event of a material breach of any representation or warranties of the Purchaser, pursuant to the terms of this Agreement or any of the Acquisition Documents, which breach would result in a condition to Closing set forth in Article IX hereof becoming incapable of fulfillment or cure (which condition has not been waived by the Seller in writing) prior to the Drop Dead Date;

(d)        by the Seller, in the event that a bid by a bidder other than the Purchaser is the higher and better bid in accordance with bidding procedures that have been approved by the Bankruptcy Court and such higher and better bid is approved by the Bankruptcy Court; or

(e)        by either party if the Closing shall not have occurred on or before August 31, 2009 (the "Drop Dead Date") if, despite the parties' reasonable and diligent efforts, the parties are unable to satisfy the conditions to Closing set forth in Articles VIII and IX hereof.

Section 11.02        Effect of Termination.

(a)        In the event of the termination of this Agreement under Section 11.01(a) there shall be no liability on the part of the Seller, the Purchaser or any of their respective Representatives.

(b)        In the event of the termination of this Agreement under Section 11.01(d) the Seller shall promptly release the Deposit (with all accrued interest thereon) to the Purchaser and, upon consummation of a sale of all or a portion of the Assets to someone other than the Purchaser (or the liquidation of any assets not in the ordinary course of the Seller's business), Seller shall promptly pay Purchaser the Expense Reimbursement

which amounts shall be Purchaser's sole recourse against the Seller or its bankruptcy estate.

(c)    If this Agreement is terminated pursuant to Section 11.01(b), Section 11.02 shall not relieve the breaching party from Liabilities to the non-breaching party(ies) arising from any breach of this Agreement, provided, however, that Seller's liability shall be limited solely to the return of the Deposit.

(d)    With respect to a termination of this Agreement pursuant to Sections 11.01(c), the Seller shall be entitled to keep the Deposit and shall be entitled to pursue any claims against the Purchaser whether in law or equity for damages, injunctive or other relief, to be compensated for any damages suffered as a result of Purchaser's material breach of this Agreement.

## ARTICLE XII.

## MISCELLANEOUS

Section 12.01        Amendment; Waiver.

Neither this Agreement, nor any of the terms or provisions hereof, may be amended, modified, supplemented or waived except by a written instrument signed by all of the parties hereto (or, in the case of a waiver, by the party granting such waiver).  No waiver of any of the terms or provisions of this Agreement shall be deemed to be or shall constitute a waiver of any other term or provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver.  No failure of a party hereto to insist upon strict compliance by another party hereto with any obligation, covenant, agreement or condition contained in this Agreement shall operate as a waiver of, or estoppel with respect to, any subsequent or other failure.  Whenever this Agreement requires or permits consent by or on behalf of a party hereto, such consent shall be given in a manner consistent with the requirements for a waiver of compliance as set forth in this Section 12.01.

Section 12.02        No Survival of Representations and Warranties.

The representations and warranties of the Seller set forth in Article IV hereof and the Purchaser set forth in Article V hereof shall not survive the Closing; provided, however, that those covenants that contemplate actions to be taken or obligations in effect after the Closing or termination of this Agreement, as the case may be, shall survive in accordance with their terms and to the extent so contemplated.

Section 12.03        Fees and Expenses.

Except as otherwise expressly provided in this Agreement, each of the parties hereto shall bear and pay all fees, costs and expenses incurred by it or any of its Affiliates in connection with the origin, preparation, negotiation, execution and delivery of this Agreement and the other Acquisition Documents and the transactions contemplated hereby or thereby (whether or not such transactions are consummated) and the performance of their respective obligations under

this Agreement, including, without limitation, any fees, expenses or commissions of any of its Representatives, none of which shall be included in the Assumed Liabilities.

Section 12.04        Notices.

      (a)        All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and mailed or facsimiled or delivered by hand or courier service:

      (i)        If to the Seller, to:

      LaVigne Inc.
      10 Coppage Drive
      Worcester MA 01603
      Attn: Chris Wells

      With a copy, which shall not constitute notice, to:

      Holland & Knight LLP
      10 St. James Avenue
      11th Floor
      Boston, MA 02116
      Attn: John Monaghan
      Fax: 617-523-6850

      (ii)        If to the Purchaser, to:

      DS Graphics, Inc.
      120 Stedman Street
      Lowell, MA  01851
      Attn: ~~Jason Pulsifer~~Jeff Pallis
      Fax:  978-569-1205

      With a copy, which shall not constitute notice, to:

      Gunderson Dettmer Stough
       Villeneuve Franklin & Hachigian, LLP
      610 Lincoln Street
      Waltham, MA 02451
      Attn: Jay K. Hachigian
      Fax:  (877) 881-3618

      (iii)        If to the Committee, to:

(b)    All notices and other communications required or permitted under this Agreement which are addressed as provided in this Section 12.04 (i) if delivered personally against proper receipt or by confirmed facsimile transmission shall be effective upon delivery and (ii) if delivered (A) by certified or registered mail with postage prepaid shall be effective five (5) Business Days or (B) by Federal Express or similar courier service with courier fees paid by the sender, shall be effective two (2) Business Days following the date when mailed or couriered, as the case may be. Any party hereto may from time to time change its address for the purpose of notices to such party by a similar notice specifying a new address, but no such change shall be deemed to have been given until it is actually received by the party sought to be charged with its contents.

Section 12.05    <u>Assignment</u>.

This Agreement and all of the terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Prior to the Effective Time, neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by the Seller or the Purchaser; provided the Purchaser may assign any of its rights, interests or obligations to any of its Affiliates, upon notice given to Seller at least three (3) business days prior to the Closing Date, provided that the Purchaser shall not be relieved of any liability under this Agreement as a result of such assignment. Any assignment made in contravention of the terms of this Section 12.05 shall be void ab initio.

Section 12.06    <u>Governing Law; Consent to Jurisdiction</u>.

(a)    This Agreement and the legal relations among the parties hereto shall be governed by and interpreted in accordance with, the laws of the Commonwealth of Massachusetts applicable to agreements made and to be performed entirely within such State.

(b)    Until the entry of an order either closing or dismissing the Bankruptcy Case, each party hereto (i) irrevocably elects as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court solely with respect to such matters, (ii) expressly waives any defense or objection to jurisdiction or venue based on the doctrine of forum non-conveniens solely with respect to any matters arising under or in connection with the Agreement, and (iii) stipulates that the Bankruptcy Court shall have in personam jurisdiction and venue over such party solely with respect to any matters arising under or in connection with the Agreement.

Section 12.07    <u>WAIVER OF JURY TRIAL</u>.

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER

ACQUISITION DOCUMENTS.    EACH PARTY HERETO (A) CERTIFIES THAT NO
REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS
REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD
NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER
AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE
BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER ACQUISITION
AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL
WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.07.

Section 12.08        Public Announcements.

         The parties to this Agreement expressly acknowledge that the Seller shall, until
the Sale Hearing, continue to solicit counterbids for the Transferred Assets as part of their duties
as Debtors. To this end, and in accordance with any bid procedures approved by the Bankruptcy
Court, the Seller may publicize from time to time the existence and details of this Agreement and
shall file this Agreement with the Bankruptcy Court as a public document, and may provide this
Agreement to other potential bidders for the Transferred Assets.

Section 12.09        Preparation of this Agreement.

         Each of the parties hereby acknowledges and agrees that (a) Purchaser and Seller
jointly and equally participated in the drafting of this Agreement and all other agreements
contemplated hereby, (b) both Purchaser and Seller have been adequately represented and
advised by legal counsel with respect to this Agreement and the transactions contemplated
hereby and (c) no presumption shall be made that any provision of this Agreement shall be
construed against either party by reason of such role in the drafting of this Agreement and any
other agreement contemplated hereby.

Section 12.10        Cooperation on Tax Matters.

         (a)        Purchaser and Seller shall furnish or cause to be furnished to each other, as
         promptly as practicable, such information and assistance relating to the Transferred
         Assets and Assumed Liabilities as is reasonably necessary for the preparation and filing
         of any tax returns, claims for refunds, or other required or optional filings related to tax
         matters, for the preparation of any tax audit, for the preparation for any tax protest, and
         for the prosecution or defense of any suit or other proceeding relating to tax matters.

         (b)        Purchaser shall retain possession of all accounting, business, financial, and
         tax records and information relating to the Transferred Assets and the Assumed
         Liabilities that are in existence on the Closing Date and transferred to Purchaser
         hereunder for a period of at least seven (7) years from the Closing Date.  Thereafter,
         Purchaser shall be permitted to destroy such records without notice to Seller.

Section 12.11        Passage of Title; Risk of Loss.

         Legal and equitable title and risk of loss with respect to all of the Transferred
Assets shall pass to Purchaser upon conveyance, assignment or transfer of such assets.  The
acceptance by Purchaser of the instruments described in Section 3.02 hereof conveying the

Transferred Assets at Closing shall constitute full performance by Seller of each and every obligation of Seller hereunder.

Section 12.12        Attorneys Fees and Costs.

In the event of a dispute hereunder, in addition to any other remedies provided for herein, the prevailing party to any such dispute shall be entitled to recover its reasonable attorney's fees, costs and expenses incurred in connection with enforcement of this Agreement, as determined by the applicable court.

Section 12.13        Entire Agreement.

This Agreement, including the exhibits, schedules and the other Acquisition Documents embody the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede all prior agreements, commitments, arrangements, negotiations or understandings, whether oral or written, between the parties hereto, their respective Affiliates or any of the Representatives of any of them with respect thereto. There are no agreements, covenants or undertakings with respect to the subject matter of this Agreement and the other Acquisition Documents other than those expressly set forth or referred to herein or therein and no representations or warranties of any kind or nature whatsoever, express or implied, are made or shall be deemed to be made herein by the parties hereto except those expressly made in this Agreement and the other Acquisition Documents.

Section 12.14        Severability.

Each term and provision of this Agreement constitutes a separate and distinct undertaking, covenant, term and/or provision hereof. In the event that any term or provision of this Agreement shall be determined to be unenforceable, invalid or illegal in any respect, such unenforceability, invalidity or illegality shall not affect any other term or provision hereof, but this Agreement shall be construed as if such unenforceable, invalid or illegal term or provision had never been contained herein. Moreover, if any term or provision of this Agreement shall for any reason be held to be excessively broad as to time, duration, activity, scope or subject, the parties request that it be construed, by limiting and reducing it, so as to be enforceable to the fullest extent permitted under applicable Law.

Section 12.15        No Third Party Beneficiaries.

Except as and to the extent otherwise provided herein, nothing in this Agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any Person other than the parties hereto and their respective successors and permitted assigns.

Section 12.16        Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same instrument.

Section 12.17        No Recordation.

Neither this Agreement nor any memorandum thereof may be recorded by Purchaser. Any such recordation shall constitute a default hereunder.

**THE REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK**

**IN WITNESS WHEREOF**, the parties hereto have caused this Asset Purchase Agreement to be duly executed as of the day and year first above written.

**SELLER**

LAVIGNE INC.

By:_____
Name:
Title:


**PURCHASER**

DS Graphics, Inc.


By:_____
Name: Jeffrey F Rallis
Title: President


SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

# LIST OF EXHIBITS AND SCHEDULES

<u>Exhibits</u>

| | |
|---|---|
| <u>Exhibit A</u> | Form of Assignment and Assumption Agreement |
| <u>Exhibit B</u> | Form of Bill of Sale and Assignment |
| <u>Exhibit C</u> | Form of Sale Approval Order |
| <u>Exhibit D</u> | Form of Escrow Agreement |

<u>Schedules</u>

| | |
|---|---|
| Schedule 2.1 | Transferred Assets |
| Schedule 4.3 | Approvals |

## EXHIBIT A

Form of Assignment and Assumption Agreement

## EXHIBIT B

Form of Bill of Sale and Assignment

## EXHIBIT C

Form of Sale Approval Order

EXHIBIT D

Form of Escrow Agreement

## SCHEDULE 2.1

The Transferred Assets shall include all of the Assets, including, without limitation, Accounts Receivable, but shall not include the Excluded Assets.

## SCHEDULE 4.3

None.

# 8690136_v5